IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TERESA K. WAGNER,

                    Plaintiff,

          v.                                Civil Action No. 2:04-CV-70

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,
                    Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    Background

       Plaintiff, Teresa K. Wagner, (Claimant), filed her Complaint on September 27, 2004, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1] Commissioner filed her Answer on January 6, 2005.[2] Claimant

filed her Motion for Summary Judgment and Memorandum in Support of Motion for Summary

Judgement on February 3, 2005.[3] Commissioner filed her Motion for Summary Judgment and Brief

in Support on March 18, 2005.[4] Claimant filed her Response to Motion for Summary Judgement on

March 31, 2005.[5]

B.    The Pleadings

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket Nos. 11 and 12.

[4] Docket Nos. 14 and 15.

[5] Docket No. 16.

1.      <u>Claimant's Motion for Summary Judgment and Memorandum in Support</u>.[6]

2.      <u>Commissioner's Motion for Summary Judgment and Brief in Support Thereof</u>.[7]

3.      <u>Claimant's Response to Summary Judgment</u>.[8]

C.      <u>Recommendation</u>

I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED, and this matter be REMANDED to the Commissioner of Social Security to determine whether Claimant has met the second prong of section 12.05(C) and the other matters addressed in this recommendation.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II. Facts

A.      <u>Procedural History</u>

On June 10, 2002, Claimant filed for Supplemental Security Income payments alleging disability since December 30, 1999.  The application was denied initially and on reconsideration. A hearing was held on January 27, 2004 before an ALJ.  The ALJ's decision, dated April 7, 2004, denied the claim finding Claimant not disabled within the meaning of the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on September 8, 2004.  This action was

---

[6] Docket No. 11 and 12.

[7] Docket Nos. 14 and 15.

[8] Docket No. 16.

filed and proceeded as set forth above.[9]

B.      Personal History

        Claimant was 42 years old on the date of the January 27, 2004 hearing before the ALJ.

Claimant has limited education and past relevant work experience as a production laborer.

C.      Medical History

        The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: December 30, 1999–April 7, 2004.

**St. Joseph's Hospital, Operative Report, 09/27/1988, Tr. 132**
OPERATION: Systematic right inguinal hernia

**St. Joseph's Hospital, Chest X-Ray, 09/23/1988, Tr. 134**
IMPRESSION: Normal Chest

**St. Joseph's Hospital, Chest and Abdomen X-Ray, 09/18/1988, Tr. 134**
IMPRESSION: Normal Chest
        Examination of the abdomen shows some amount of feces along the right side of the
colon.  Gas in the small and large intestine is noted.  The overall gas pattern suggests a mild ileus
pattern.  The are no abnormal calcifications nor free air in the peritoneal cavity.  The visualized
bones fail to demonstrate any gross evidence of fracture.

**St. Joseph's Hospital, Skull X-Ray, 02/25/1989, Tr. 135**
IMPRESSION: No abnormalities seen with regard to nasal bones, normal skull

**St. Joseph's Hospital, Emergency Service Record, 05/02/2001, Tr. 136-142**
IMPRESSION: Colles Fracture Distal Right Radius.

**St. Joseph's Hospital, Operative Report, 05/09/2001, Tr. 143-146**
OPERATION: External fixator application comminuted fracture left distal radius.

**St. Joseph's Hospital, Radiology Report, 10/30/01, Tr. 147-153**
FINDINGS: There is a Colles fracture of the distal radius.  Fracture lines extend into the distal

---

[9] Claimant previously filed an application for disability benefits.  On April 14, 2000,
Claimant filed for Supplemental Security Income payments alleging an onset date of January 1,
1997.  The claim was denied at the reconsideration level on August 14, 2000, without further
appeal.

articular cortex. No other fractures or dislocations are seen.

**The Appalachian Community Health Center, Crisis Intake, 01/31/2001, Tr. 154-156**
DIAGNOSTIC IMPRESSION: Alcohol dependence, borderline intellectual functioning, primary support problems, inadequate finances

**The Appalachian Community Health Center, Crisis Intake, 04/10/2002, Tr. 157-159**
DIAGNOSTIC IMPRESSION: Alcohol abuse, partner relational problem, borderline intellectual functioning, discord with ex-husband

**St. Joseph's Medical Plaza, 02/04/2002, Tr. 160-162**
On physical examination she does have an odor of alcohol on her breath today at about 1:30 in the afternoon.

CLINICAL IMPRESSION: Hypothyroidism, mitral valve prolapse, alcohol abuse/questionable dependence, questionable asthma.

**St. Joseph's Medical Plaza, 01/08/2002, Tr. 163**
CLINICAL IMPRESSION: Illness of uncertain etiology. History of connective tissue disorder. New heart murmur. Possible bacteria endocarditis.

**St. Joseph's Medical Plaza, Progress Notes, 12/31/2001, Tr. 164**
Patient alert and oriented, no rashes on external genitalia, no lesions on cervix

**St. Joseph's Medical Plaza, Physical Exam, 12/06/2001, Tr. 166**
no rashes, no masses on breast

**St. Joseph's Medical Plaza, 10/31/2001, Tr. 167**
Teresa showed up twenty minutes late, needed to be the last appointment of the day when scheduled. Dr. Maley had already left for the day. Patient smelled very strong of alcohol with slurred speech.

**St. Joseph's Hospital, Radiology Report, 07/01/2002, Tr. 171**
IMPRESSION: Mildly enlarged pituitary gland with mass effect of the infundibulum. Macroadenoma suspected.

**St. Joseph's Hospital, Laboratory Report, 06/18/2002, Tr. 172**
DIAGNOSIS: Screening Unable to read.
    -CK was high (238) and should be 26-120 IU/L
    -TSH-Ultrasens was high (702.38) and should be .49-4.67 uIU/mL
      -Specimen diluted to obtain result

**St. Joseph's Hospital, Radiology Requisition, 06/18/2002, Tr. 173**
CLINICAL DATA: 40 years, with family history of breast cancer

IMPRESSION: Category 1- Negative, Annual mammogram

**St. Joseph's Hospital, Echocardiography Report, 1/14/2002, Tr. 174**
INTERPRETATION: Normal LV function, moderate MR and trace TR

**St. Joseph's Hospital, Laboratory Report, 01/08/2002, Tr. 176**
RESULT: ESR was high (24) and should be 0-20 mm/Hr

**University Medical Laboratories, 01/08/2002, Tr. 177**
ANTI-NUCLEAR AB QUANT: Negative 1:40

**St. Joseph's Hospital, Dr. W.J. Sembello, Jr. MD, 01/08/2002, Tr. 178-179**
CULTURE COMMENT: No growth at 24 hours, no growth at 72 hours, final at 5 days.

**St. Joseph's Hospital, Radiology Report, 01/08/2002, Tr. 180**
FINDINGS: The chest was examined in the erect PA and lateral projections. Heart size and contour are within normal limits. The hilar areas are clear. There are no infiltrates. Pleural fluid is not seen. There are no cervical ribs. The trachea is in the middle position.
IMPRESSION: No acute process.

**St. Joseph's Medical Plaza, OB/GYN, 01/07/2002, Tr. 181**
PAP Smear within normal limits.
**West Virginia University Hospitals, Inc., Cytopathology Report, 12/31/2001, Tr. 182**
Specimen satisfactory for evaluation, but limited by LACK of endocervical/squamous metaplastic cells.
      Within normal limits
         -Predominance of Coccobacilli

**West Virginia University Hospitals, Inc., Cytopathology Report, 12/07/2001, Tr. 183**
Unsatisfactory for evaluation.
      -Smear consists predominately of hyperkeratosis.

**St. Joseph's Hospital, Laboratory Report, 12/06/2001, Tr. 184**
TSH-Ultrasens was high (361.86) should be .49-4.67 uIU/mL
      -Specimen diluted to obtain results

**St. Joseph's Hospital, Radiology Report, Chest X-Ray, 05/05/2001, Tr. 185**
IMPRESSION: No acute Process

**University Health Associates, Neurosurgery, 07/15/2002, Tr. 186-189**
Diagnosis: Asymptomatic pituitary enlargement, Positive pituitary adenoma.

**West Virginia Disability Determination Service, Evaluation, 10/04/2002, Tr. 190-196**
DIAGNOSTIC IMPRESSIONS: Cognitive disorder deferred (possible brain tumor), alcohol

abuse(history), borderline intellectual functioning, reported "bone disease", "disc disease", recent left wrist fracture, brain tumor, colitis, hyperthyroidism, allergies, possible childhood seizure disorder, and childhood diabetes.

      Concentration- moderately deficient
      Persistence- fair
      Pace- marked slowly
      Recent Memory- markedly deficient

**West Virginia Disability Determination Service, Internal Medical Examination, 03/05/2003, Tr. 197-202**
IMPRESSIONS: Right radius fracture status post open reduction internal fixation.
           -residual postoperative superficial radial nerve paresthesias
      Asthma, according to the claimant
         -history of chronic tobacco use, consider asthmatic bronchitis
      Diabetes, mellitus, apparently diet controlled
      Chronic back pain
         -chronic thoracolumbar myofascial pain.
      History of umbilical hernia status post repair, current adominal symptoms, etiology unclear
      History of cervical cancer status post surgery without recurrence
      Pituitary macroadenoma, apparently stable

**Eli Rubenstein, M.D., Inc., X-Ray Report, 03/05/2003, Tr. 203**
IMPRESSION: Normal Chest, Normal Lumbar Spine

**Ventilatory Function Report Form, 03/05/2003, Tr. 204**
INTERPRETATION: Very mild restrictive disease.  Improvement after bronchodilation.

**Pulmonary Function Report Form and Post-Bronchodilator Report, 03/05/2003, Tr. 205-207**
INTERPRETATION: Mild restrictive ventilatory defect.  This is indicated by the finding of a mildly reduced forced vital capacity (FVC).  The finding of a disproportionately reduced forced expiratory flow during the middle half of exhalation (FEF 25-75) suggests the possibility of a superimposed early obstructive pulmonary impairment.  Bronchodilator therapy was administered followed by repeat spirometric testing.  The FEF 25-75 is significantly increased indicating that this patient would most likely benefit from continued bronchodilator therapy.

**Psychiatric Review Technique, 12/18/2002, Tr. 210-224**
DISORDER: D.B.F.
Claimant's level of Etoh use is unknown.  While she indicates there is no problem, evidence of use/abuse was noted in 2 PCP visits.
FUNCTIONAL LIMITATION: Restriction of activities of living daily- mild, difficulties in maintaining social functioning- mild, difficulties in maintaining concentration, persistence, or pace- moderate

**Mental Residual Functional Capacity Assessment, 10/18/2002, Tr. 225-228**
FUNCTIONAL CAPACITY ASSESSMENT: Her concentration and pace were significantly limited.

**Mental Residual Functional Capacity Assessment, 03/27/2003, Tr. 229-237**
LIMITATIONS: NONE

**Family & Marital Counseling Center, Inc., Psychological Evaluation, 11/04/2003, Tr. 244-248**
DIAGNOSES-DSM-IV: Major depressive disorder, recurrent, severe, without psychotic features, physical abuse as an adult, posttraumatic stress disorder, alcohol abuse (by history), borderline intellectual functioning

**Amy Hamilton Pearson, MD, 05/12/2003, Tr. 249**
ASSESSMENT: Allergic rhimitis

**Amy Hamilton Pearson, MD, 04/02/2003, Tr. 250**
ASSESSMENT: Adenopathy

**Amy Hamilton Pearson, MD, 01/29/2003, Tr. 252**
ASSESSMENT: Macroadenoma with hypothyroidism

**St. Joseph's Hospital, Laboratory History Report, 05/15/2003, Tr. 256**
TSH-3rd Gen. was high (503.80) should be .34-5.6 uIU/mL
    -dilution performed to obtain result

**St. Joseph's Hospital, Laboratory History Report, 10/29/2002, Tr. 257**
TSH-3rd Gen. was high (488.04) should be .71-4.67 uIu/mL
    -specimen diluted to obtain result

**St. Joseph's Hospital, Chemistry-General/Chemistry-Special, 06/18/2002, Tr. 258**
CK was high (238) should be 26-120 U/L
TSH-3rd Gen. was high (702.38) should be .49-4.67 uIU/mL
    -specimen diluted to obtain result

**St. Joseph's Hospital, Hematology, 01/08/2002, Tr. 259**
ESR high (24) should be 0-20 mm/Hr

**St. Joseph's Hospital, Laboratory History Report, 12/06/2001, Tr. 260**
TSH-3rd Gen. was high (361.86) should be .49-4.67 uIU/mL
    -specimen diluted to obtain result

**St. Joseph's Hospital, Bilateral Mammography, 08/26/2003**
IMPRESSION: BI-RADS category 1, if the patient has a palpable mass, the decision to biopsy

will depend on clinical evaluation since approximately 20% of palpable carcinomas are not seen on mammography. Yearly follow up is suggested.

**St. Joseph's Hospital, Radiology Report, MRI of brain and pituitary gland, 03/20/2003, Tr. 262**
IMPRESSION: Slightly enlarged pituitary gland, unchanged since 07/01/2002, no other significant abnormality is identified.

**St. Joseph's Hospital, Radiology Report, MRI of brain and pituitary, 06/27/2002, Tr. 263**
IMPRESSION: Mildly enlarged pituitary gland with mass effect of the infundibulum. Macroadenoma suspected.

**The Appalachian Community Health Center, Comprehensive Psychiatric Evaluation, 11/18/2003, Tr. 264-268**
IMPRESSION: This 41 year old with a history of behavioral problems in youth, probable very dysfunctional family situation, history of being in an abusive relationship with her husband certainly appears to have some PTSD type symptoms and probably disturbance. The extent to which her pituitary tumor is contributing to this is unknown. There is also concern about her history of Seizure Disorder. However, she has been drinking on and off and has not had and seizure problems so it may really not be an active issue.
     -Major depression with psychotic features
     -Post Traumatic Stress Disorder
     -Alcohol Dependence- in current remission
     -Nicotine dependence
     -mild mental retardation
     -Pituitary tumor, hypothyroidism, history of seizures, cataracts, social stressors, GAF 38

**The Appalachian Community Health Center, Psychological Evaluation, 05/17/1978, Tr. 269-272**
TEST EVALUATIONS: Mildly intellectually impaired range of mental ability when compared to others her age. Scored a one on the Vocabulary Design subtest, showing her to be very limited in her fund of verbal information at the general range of her ideas gained from experience and education. Her highest level of adaptive behavior functioning falls in the mildly retarded range.

D.     Testimonial Evidence
1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 284-312):

A    My thyroid and my tumor's acting up worse, and if I do a standing job of any kind, my legs give up on me. I get paralyzed, my legs won't move. That's what it feels like. If I sit very long, I still get the same spells I'm about to faint, I get sick and get head aches a lot. I get weak all the time where I have to lay down. I feel exhausted all the time.

*          *          *

A    I get weak and black out through the day, throughout the day, usually. And I usually just have to lay down.

Q    Do you have headaches?

A    I have headaches all the time.

Q    Do you think those are caused by this tumor?

A    Yeah.

Q    Have your doctors talked with you about what problems this tumor is causing you?

A    My eye doctor just found out I got another cataracts [sic] in my other eye because of the tumor, and I just had new glasses in June with bifocals, and he said there wasn't no point in even wearing them because it's the tumor, and told that doctor that you know, my glasses ain't helping or nothing and I be going blind, losing my hearing both real soon if they can get to doing surgery or something, which they said they can't do yet.

Q    Okay. Now, you seem to believe that this tumor is causing you an awful lot of problems, is that right?

A    Pretty much, things got worse since I had the tumor three years ago.

Q        Ms. Wagner, are you also being treated for major depression?

A        Yeah.

Q        And do you think you have that?

A        Yeah.

Q        Can you tell me what you mean by depression?

A        Well, I cry a lot for no reason.  I don't sleep good.  They had to give me a pill also to take at night to help me sleep, which still don't help much.  With the headaches and everything, I have trouble sleeping.

Q        Do you feel pretty down sometimes?

A        [INAUDIBLE].

Q        You also - - do you have any idea what caused any of those problems?

A        Well, I've been to the doctor's pretty much every day of the month.  I'm wore out all the time and that kind of brings me down.  Once in a while I go to my meetings - - AA meetings once a week.  I get real exhausted.

Q        Now, Ms. Wagner, I don't want to get into a lot of - - I don't want to get in - - I don't want to ask you about your past particularly, but are you being treated for post traumatic stress disorder?

A        Yeah.

*         *         *

Q        Do you have any problems with remembering or concentrating?

A        Yeah.  I forget easily.

*          *          *

Q     Do you ever forget to do things you're supposed to do?

A     Yeah.

Q     Do you ever - - can you follow through a TV show from the beginning to the end?

A     No.

Q     Can I ask you some questions about what you do during the day?  Do you sleep

well?

A     No, not really anymore.

Q     What prevents you from sleeping well?

A     Well, my - -

Q     What causes you not to sleep well?

A     - - wrist bothers me a lot and tossing and turning and my headaches.  There ain't

nothing I can take for it.  They don't want me taking no more Tylenol or anything because of the

tumor.

*          *          *

Q     Do you have trouble finding in the store what you're looking for?

A     Pretty much.

Q     That - - does that - - does your friend drive you wherever you need to go?

A     Yeah.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr.

311-315 ):

ALJ     Please assume a younger individual with a limited education, with marginal abilities to read and write, precluded from performing all but sedentary work. Before I go to that, Ms. Wagner, did you have a right wrist fracture in the past? Was that in the '80's or was it more recent?

CLMT        No. That was around '99.

ALJ         Okay.

UNK         2001.

CLMT        Something like that.

UNK         I think it's in - -

CLMT        I think it's 2001.

ALJ         Maybe 2001?

CLMT        Well, yeah, because it's been about three years.

ALJ         Okay. And you had - - an ex-boyfriend fractured that for you, didn't he?

CLMT        Yeah.

ALJ         Okay. What's going on with your right wrist now?

CLMT        I've got to go see about a bone specialist. My doctor said I needed to - - I - - it just feels like a knife going through my wrist up my arm all the time.

ALJ         Um-hum.

CLMT        And then it just goes numb when I end up not feeling it at all.

ALJ         And you had cervical cancer surgery, no recurrence?

CLMT        Yeah.

ALJ         Okay. And you had a hernia, right?

CLMT          Yeah.

ALJ           Umbilical hernia?

CLMT          Yeah.

ALJ           How's that?  Did you recover from that?

CLMT          Yeah, except for my disc was bad.  Of course, I'm delaying the back surgery on that.

ALJ           Okay, Mr. Bell.  [INAUDIBLE] was light - - sedentary work.  No hazards, such as machinery and heights, a controlled environment free of excessive dust and fumes, and work that is - - requires only occasional posturals that's unskilled and low stress, defined as one and two step processes, routine and repetitive tasks, primarily working with things rather than people, entry level.  With those limitations, can you describe any work this hypothetical individual can perform?

VE            Yes, Your Honor.  At the sedentary level, that hypothetical individual could function as an assembler, sedentary, 149,000 nationally, 1,450 regionally.  And the region is West Virginia, Eastern Ohio, Western Pennsylvania, and Western Maryland.  Or machine tender, sedentary, 141,000 nationally, 1,400 regionally.

ALJ           Are those jobs consistent with the DOT?

VE            Yes, Your Honor.

ALJ           Sir, if the Claimant's concentration was impacted where she could not stay on task one-third to two-thirds of the workday, are those jobs available?

VE            Yes, Your Honor.

                              *              *              *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q      Mr. Bell, how many days per month could someone miss in these types of jobs and still remain employable?

A      You couldn't miss more than two days consistently. I believe that would - - the supervisor would intervene. And if I'm correct, it would result in termination.

Q      Okay. Mr. Bell, the Judge, I think, gave you a hypothetical indicating that the person was going to be off from one-third to two thirds of the workday. If the person were going to be off let's say just one-third of the workday, how would that effect their employability?

A      If this would be consistent, that would eliminate it.

Q      Do you have any idea - - I mean, is one-third of the day the line or is there some period?

A      That would be specific to different sites.

Q      Okay. Based on the testimony of Ms. Wagner here today, if a Claimant were going to need to lay down throughout the day due to flare-ups of her medical condition outside of the normal lunch and break periods, how would that affect her employability?

A      That wouldn't be allowed on an ongoing basis.

   E.     <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the

Claimant's alleged impairments affect her daily life.

• Smokes. (Tr. 290).

• History of alcoholism. (Tr. 290).

• Walks for exercise. (Tr. 304).

• Watches soap operas. (Tr. 304).

• Sometimes babysits her friend's son. (Tr. 304).

• Occasionally goes out to eat. (Tr. 304).

• Cooks. (Tr. 305-306).

• Spends time with her friends. (Tr. 305-306).

• Goes to church. (Tr. 311).

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ: (1) erred in failing to find that Claimant met the requirements of Listing 12.05C; (2) erred in failing to include all of Claimant's limitations in his hypothetical to the vocational expert and final RFC; (3) erred by accepting the opinions of the State Agency reviewers; and (4) erred in failing to resolve conflicts between the VE testimony and the Dictionary of Occupational Titles, as required by SSR 000-4p.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ (1) properly determined  that Claimant's borderline intellectual functioning did not meet the requirements of a disabling impairment under §12.05(C); (2) properly included all of Claimant's limitations in the hypothetical to the VE; and (3)

properly relied on the state agency reviewing psychologists; opinions in evaluating Claimant's Claim. The Commissioner further states that there is no conflict between the VE's testimony and the DOT; in the alternative, the Commissioner argues that if there were a conflict, the ALJ satisfied the requirements of Social Security Ruling 00-4p when he asked the VE whether there was a conflict and provided an opportunity for clarification.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.     Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.     Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.  Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.      Social Security - Substantial Evidence - Listed Impairment. In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment. Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ must identify the standard to be applied. Id. at 1173. The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts. Id.

11.      Social Security - Mental Impairment and Development of the Record. The pertinent inquiry is "whether the record contained sufficient medical evidence for the ALJ to make an informed decision as to alleged mental impairments." Mathews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989). that Claimant is disabled. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability. Id. No special significance will be given to the source of an opinion on issues reserved

to the Commissioner. 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

12. <u>Social Security - Non-treating physician</u>. It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. <u>Hayes</u>, 907 F.2d at 1456. The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. <u>Id</u>.

13. <u>Social Security - Mental Disorders -- Supported by Medical Evidence</u>. The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment(s) as well as consideration of the degree of limitation such impairment(s) may impose on the individual's ability to work and whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.00.

14. <u>ALJ's Duty to Inquire Into the Evidence</u>. "[T]he ALJ has a duty to explore all relevant facts "[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." <u>Walker v. Harris</u>, 642 F.2d 712, 714 (4th Cir. 1981). <u>See also</u> <u>Cook v. Heckler</u>, 783 F2d 1168 (4th Cir. 1986). When failure to inquire into the additional evidence is prejudicial to the Claimant then the case should be remanded. <u>Marsh v. Harris</u>, 632 F.2d 296, 300 (4th Cir. 1980).

15. <u>Social Security - Vocational Expert</u>. Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that

a significant number of other jobs are available in the national economy which the claimant can perform. 20 C.F.R. §§ 404.1520(f), 416.920(f).

16. <u>Social Security - Vocational Expert - Hypothetical</u>. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 50-51 (4th Cir. 1989). The ALJ is afforded "great latitude in posing hypothetical questions," <u>Koonce v. Apfel</u>, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[10], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations. <u>Copeland v. Bowen</u>, 861 F.2d 536, 540-41 (9th Cir. 1988).

17. <u>Vocational Expert Purpose.</u> "The purpose of bringing in a vocation expert is to assist

the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." <u>Cline v. Chater</u>, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996). "[R]equiring the testimony of a vocational expert is discretionary." <u>Hall v. Harris</u>, 658 F.2d 260, 267 (4th Cir. 1981).

18. <u>Vocational Expert and the DOT</u>. SSR 00-4p states in part that "occupational evidence provided by a VE or vocational specialist (VS) should be consistent with the occupational information supplied by the D.O.T. When there is an apparent unresolved conflict between VE or

---

[10] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

VS evidence and the D.O.T., the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled."

19.  <u>DOT</u>.  "Evidence from VEs or VSs can include information not listed in the DOT. The DOT contains information about most, but not all, occupations. The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term 'occupation,' as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs.  Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling. The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT."  SSR 00-4p

20.  <u>Mental Disorders</u>.  The evaluation of disability on the basis of a mental disorders requires the documentation of a medically determinable impairment(s) as well as consideration of the degree of limitation such impairment(s) may impose on the individual's ability to work and whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. 20 C.F.R. Pt. 404, Subpt P, App. 1, Listing 12.00.

21.  <u>Sedentary work</u>.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking is often necessary

in carrying out job duties. Jobs are sedentary if is walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a).

22. <u>Social Security - Severe Impairment</u>. An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). <u>See</u> <u>also</u> <u>Byrd v. Apfel</u>, No. 98-1781, slip op. at 2 (4th Cir. Dec. 31, 1998);[11] Social Security Ruling 85-28.

23. <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. <u>Id</u>. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. <u>Id</u>. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. <u>Id</u>. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. <u>Id</u>.

24. Social Security - Listing. The ALJ must fully analyze whether a Claimant's

---

[11] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

impairment meets or equals a "Listing" where there is factual support that a listing could be met. Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986). Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." Russell v. Chater, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[12] In determining disability, the ALJ is required to determine whether claimant's condition is medically equal in severity to a listing. 20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence. Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984). See also Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980).

C.     Discussion

1. Failure to Find that Claimant Met the Requirements of Listing 12.05C.

Claimant contends that the ALJ erred because he failed to find that Claimant met the requirements of Listing 12.05C. Commissioner countered that the ALJ properly found that Claimant has not shown that she meets the requirements for disability.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.

---

[12] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

The issue is whether there is substantial evidence to support the ALJ's finding that

Claimant did not meet the listed impairment for mental retardation. The listing of section

12.05(C) of Appendix 1 is as follows:

> Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22...

> The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied.
> . . .
> C. A valid verbal, performance, or full scale IQ of 60 to 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function....

Moreover, 20 C.F.R. Part 404, Subpt. P., App. 1 §12.00 (D)(6)(c) provides, in relevant

part:

> ...In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.[13]

The Undersigned finds that Claimant meets the first requirement under section 12.05(C).

Claimant underwent two separate psychological evaluations. In October 2002, Morgan Morgan,

MA, psychologically evaluated Claimant at the request of Disability Determination. The testing

revealed that Claimant's Verbal IQ measured at 71, her Performance IQ was 68, and her Full-

Scale score of 67. Mr. Morgan opined that the testing was a "fair" estimate of Claimant's true

intellectual functioning. (Tr. 21). Mr. Morgan opined that Claimant was operating on the

borderline level of intellectual functioning. (Tr. 21).

---

[13] See also Kennedy v. Heckler, 739 F.2d 168 (4th Cir. 1984)(the regulations mandate that when a single IQ test produces multiple scores, the lowest score is to be used in conjunction with §12.05).

In November, 2003, at the request of counsel, Dr. Robert J. Klein, Ed. D. conducted a psychological evaluation of Claimant. Claimant's verbal IQ was measured at 70, her Performance IQ was 77, and her Full-Scale score was 71. Dr. Klein stated that Claimant appeared to put forth her best effort. Dr. Klein also opined that Claimant was operating at the borderline level of intellectual functioning.

The ALJ considered this psychological evidence and concluded that Claimant did not meet the section 12.05 listing. The ALJ discounted the results of the intelligence tests on the basis of Mr. Morgan's statement that his finding was only a fair estimate of Claimant's intellectual functioning and that Claimant's functioning might have been influenced by alcohol and her long history of abuse. (Tr. 21). The ALJ did not find "the low assessment to be a valid representation of her intelligence, considering her present functioning and her vocational history." (Tr. 21).

As was noted above, it is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. The court cannot substitute its own opinion for that of the Commissioner. However, because the Commissioner uses the lowest of the three scores in the WAIS-R series of tests, the results of two tests placed Claimant within the I.Q. range of section 12.05(C). Additionally, the other evidence was not inconsistent with the low scores. On November 18, 2003 Dr. Cheryl France, M.D., conducted a psychiatric evaluation and reviewed Claimant's childhood records, which contained IQ testing administered when Claimant was 16 years old. Dr. France noted that "psychological testing done in 1978 revealed that [Claimant] was Mildly Mentally Retarded. She had a Full Scale IQ of 59." (Tr. 265). After conducting Claimant's evaluation, Dr. France opined that Claimant's "intellectual functioning does appear to

be in the Mildly Mentally Retarded range." (Tr. 267).

Pursuant to Listing 12.05, Claimant's score falls within the 60 to 70 range, indicating mental retardation. Therefore, the ALJ erred in finding that Claimant did not meed the I.Q. criteria of the section 12.05 listing.

Having found substantial evidence to support the first prong of Listing 12.05(C), Claimant must also demonstrate that there is physical or mental impairment imposing "an additional and significant work-related limitation of function" under 12(C). The regulations provide that to determine whether an impairment imposes an additional and significant work-related limitation of function as required by Listing 12.05(C), the Social Security Administration will assess whether the impairment is severe under section 404.1520 (c). See 20 C.F.R. Pt. 404, Subpt. P., App. 1 12.05(A). "Severe impairment" is defined in section 404.1520 (c) as having an "impairment or combination of impairments which significantly limits [a claimant'] physical or mental ability to do basic work activities." See 20 C.F.R.404.1520 (c). Therefore, the Undesigned recommends that the case be remanded with instructions for the ALJ to determine whether Claimant has met the second prong of section 12.05(C).

2. Failure to Include All of Claimant's Limitations in the Hypothetical

Claimant contends that the ALJ erred in failing to include all of Claimant's limitations in his VE hypothetical. The Commissioner counters that the ALJ included all of Claimant's limitations and posed a proper hypothetical to the VE.

The question is simply whether the hypothetical question properly set forth all the relevant evidence of record concerning Claimant's impairments. Since a VE's opinion, in order to be relevant, must be one that is based on all evidence in the record, it is necessary for the VE to be

26

given a proper hypothetical upon which he can make a response. The opinion must be based on the Claimant's condition as shown by the entire record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). Moreover, the ALJ need only pose those hypothetical questions that are based on substantial evidence and accurately reflect the claimant's limitations. Copeland v. Bowen, 861 F.2d 536, 540-541 (9th Cir. 1988). An ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ. France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1986)).

In this case, the ALJ's hypothetical to the VE did not refer to any of Claimant's mental limitations referenced in her psychological assessments. The hypothetical posed by the ALJ asked the VE to assume "a younger individual with limited education, with marginal abilities to read and write" and impacted/affected concentration. (Tr. 313). With respect to Claimant's RFC, the hypothetical assumed a capacity for sedentary work that requires "no hazards, such as machinery and heights, a controlled environment free of excessive dust and fumes, and work that is - - requires only occasional posturals that's unskilled and low stress, defined as one and two step processes, routine and repetitive tasks, primarily working with things rather than people, entry level." (Tr. 312, 313).

In her motion, Claimant states that "while this record contains evidence of specific and significant mental limitations, the VE is never allowed to consider her true limitations." Although Claimant fails to name any specific limitations she would like to be included, the Undersigned agrees with Claimant and finds that the hypothetical did not accurately convey all of

Claimant's impairments, and the limitations they cause and, therefore, the ALJ's decision is not supported by substantial evidence.

The Fourth Circuit has held that an ALJ'd hypothetical must included all of a claimant's impairments that are supported by the record. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). The only limitations that relate to Claimant's mental impairments are the limitations to routine and repetitive tasks, marginal abilities to read and write and affected concentration. These limitations do not adequately convey all of Claimant's limitations. The Undersigned finds that the ALJ's hypothetical was deficient and the VE's answer to it does not constitute substantial evidence for the ALJ's decision. It should be noted, however, the ALJ's findings may be revised in his decision issued following the remand.

3. Error in Relying Upon the Opinions of the State Agency Reviewing Psychologists

Claimant contends that the ALJ erred by accepting the opinions of the state agency reviewers because they were not able to review evidence submitted after the date of their assessment. The Commissioner counters that, because the state agency opinions are based on the medical evidence that is present in the record at the time of a claimant's application for benefits, these opinions remain a part of the medical evidence on which the ALJ bases his opinion.

This court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether the correct law was applied. Taken together with the record as a whole, a non-examining provider's medical opinion can be considered when forming the basis of an ALJ's opinion. See Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004)(opinion of a consulting physician who does not examine the claimant does not ordinarily constitute substantial evidence). "Because the Commissioner's decision indicates that the opinion of the

consultative physician was considered and provides reasons for the weight accorded to that physician's report, we find no violation of SSR 96-6p." Mitchell v. Barnhart, No. 03-1131, 2003 EL 1565467 at *1 (4th Cir. Mar. 27, 2003). See also Robinson v. Barnhart, 366 F.3d 1078 (10th Cir. 2004)("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all.") (citing 20 C.F.R. §416.927(1), (2) and SSR 96-6p).

In his decision, the ALJ stated the following:

> The Administrative Law Judge accepts the opinions of the State Agency physicians and consultants that the claimant is not disabled and able to perform work-related activities. The undersigned has added additional functional, exertional, postural and environmental limitations in consideration of the medical evidence of record, including the claimant's subjective complaints to the extent they are credible. (Tr. 30).

The ALJ in this case did not rely solely on the state agency opinions to reach his conclusion. Rather, he relied on their opinion as one part of the record. See SSR 96-6p, 1996 WL 374180 at 1-3(SSA July 2, 1996)(an ALJ must treat expert opinion evidence of non-examining providers in conjunction with the other evidence of record).

Although the ALJ's statement is concise, the Undersigned finds that it meets the requirements of SSR 96-6p. Accordingly, the ALJ did not err in considering the opinions of the state agency psychologists.

## 2. Failure to Include all of Claimant's Limitations in her Final RFC

and

## 4. Conflicts between the VE testimony and the Dictionary of Occupational Titles, Pursuant to SSR 00-4p

Finally, Claimant alleges that the ALJ failed to included all of Claimant's limitations in her RFC. Claimant also argues that the ALJ failed to resolve conflicts between the VE testimony and the DOT. The Commissioner counters that the ALJ properly determined Claimant's RFC, and that no conflict exists between the VE's testimony and the DOT. In the alternative, the Commissioner argues that if there were a conflict, the ALJ satisfied the requirements of SSR 00-4p when he asked the VE whether there was a conflict and provided an opportunity for clarification.

Having concluded for the above stated reasons that remand to the ALJ is appropriate, the Undersigned will not address these issues, as the ALJ's findings may be revised in his decision issued following the new hearing.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be DENIED, and this matter be REMANDED to the Commissioner of Social Security to determine whether Claimant has met the second prong of section 12.05(C) and the other matters addressed in the recommendation.

2. Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be

submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: January 6, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE